UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

HUGO RUFINO ALVAREZ-REYES,

    Petitioner,

v.

BRAD CAIN,

    Respondent.

Case No. 2:17-cv-00181-AA

OPINION AND ORDER

AIKEN, District Judge:

Petitioner brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for sexual abuse and alleging the ineffective assistance of trial counsel. Respondent argues that petitioner claim is unexhausted and barred from federal review through procedural default. Regardless of exhaustion, petitioner's claim fails on the merits and the petition is denied.

## BACKGROUND

In August 2009, petitioner was charged with one count of Sodomy in the First Degree and one count of Sexual Abuse in the First Degree. Resp't Ex. 102. The charges against

petitioner arose from the abuse of his then-girlfriend's daughter, KN, when she was eight years old. Petitioner denied the charges and proceed to trial by the court. Trial Transcript (Tr.) at 9. The court heard the following evidence at trial.

KN was raised by her paternal great-grandmother, Lola Scott, in Grants Pass, Oregon. Tr. 262-65. At the time of the alleged incident, petitioner lived with Kim Lewis, KN's biological mother, and two young sons in Salem, Oregon. Tr. 15. Scott allowed KN to have visitation with Lewis and her biological father, Niles Nevin, who lived in Grants Pass. Tr. 267-69.

In December 2008 or January 2009, KN visited Lewis and planned to spend several nights with her. Tr. 272-73. During this visit, Lewis phoned Lola Scott stating that KN was hysterical, crying and demanding to return home. Tr. 274. Lewis brought KN back home to Grants Pass that day. Tr. 275-76, 342.

In June 2009, six months after KN visited her mother in Salem, Lola Scott believed something was wrong with KN, because she was "acting out," her grades were poor, and she was getting into trouble. Tr. 280. Lola Scott talked to her daughter, Debbie Scott about KN's behavior. Tr. 280-81. In turn, Debbie Scott asked Brittanie Logan, her granddaughter and K.N.'s cousin, to ask KN what was wrong. Tr. 241, 281.

KN first told Logan that she did not like petitioner because "he didn't like things other people's way." Tr. 244. KN then told Logan that, when visiting Lewis, she had woken up to petitioner licking hear "area," meaning her vagina. Tr. 42-43, 241-44, 276. Logan informed Debbie Scott what KN had told her, and Debbie Scott informed Lola Scott of K.N.'s allegations. Tr. 248, 281.

KN was scheduled to visit Lewis in Salem the next morning, and KN told Lola Scott that she did not want to go. Tr. 283, 352. Lola Scott told KN that she knew something had happened

during KN's last visit at Lewis's house, and she asked KN to tell her what had happened. KN told Lola Scott that she had woken up to defendant licking her "down there." Tr. 281-82.

Lola Scott then called another daughter, Bobbie Morrocco, who worked for the Oregon Department of Human Services (DHS) as a child welfare officer. Tr. 146, 284. Morrocco told Lola Scott to call law enforcement and the on-call worker for child welfare and "make a report." Tr. 151. Lola Scott then took KN to Debbie Scott's house. Tr. 284-85. The next day, Lola Scott, Nevin, and Morrocco took KN to the Jackson County children's advocacy center to be interviewed by Oregon State Police Detective Harris-Powers. Tr. 94, 98, 103-04, 285. Det. Harris-Powers knew Morrocco in a professional capacity and had worked with her "several times over the last six years." Tr. 95. When questioned by Det. Harris-Powers, KN repeated the allegation that petitioner had touched and licked her vaginal area. Several weeks after KN's allegations, Morrocco conducted an audiotaped interview of KN, during which KN stated that she wanted to live part time with Lola Scott and part time with Nevin. Tr. 149-53.

When questioned at trial, KN testified that she was awakened by petitioner one night as he rubbed the area above her vagina. Tr. 39-41. KN testified that petitioner began licking the area above her vagina and then touched her vagina with his tongue for about one minute. Tr. 42-43. KN was also questioned about several discrepancies in her statements, and her recorded interview with Det. Harris-Powers was played for the court. Lola Scott testified about KN's disclosures and Scott's attempts to gain permanent custody of KN prior to the allegations against petitioner. Lewis had opposed Lola Scott's efforts, and the matter was dropped. Tr. 281-84, 288, 302, 305-08, 310; Resp't Ex. 121. Lewis (by then married to petitioner) testified about KN's visits to her home and her intent to seek partial custody of KN before the allegations were lodged against petitioner. Tr. 341-42, 350-51. Several witnesses also testified about Nevin's desire to

obtain custody of KN, as well as Morrocco's involvement with KN's custodial issues. Tr. 156-57, 172-74, 177, 181, 252-53.

In petitioner's defense, counsel highlighted the custody issues surrounding KN, Morrocco's involvement in KN's custodial arrangements, the discrepancies in KN's disclosures, and weaknesses in the forensic interview conducted by Det. Harris-Powers. Tr. 387-97. Counsel also presented the testimony of Dr. Christopher Johnson, an expert who specialized in sex offender evaluations and treatment. Tr. 197. Dr. Johnson testified the forensic interview of K.N. was problematic in terms of suggestibility and interviewer bias. Tr. 200, 206-11. In particular, Dr. Johnson testified that Det. Harris-Powers relied on leading questions and that KN often incorporated the detective's comments or changed her story based on the detective's comments. Tr. 206-07. Dr. Johnson concluded:

> I believe that the interview had problems of interviewer bias, I think it had problems of suggestibility, I think it had problems of not dealing with possible stereotyping that had been done of the defendant, and problems of not pursuing alterative hypotheses.
>
> ***
>
> I believe this interviewer was looking for information to establish a way to confirm the report of abuse and did not follow up alternative theories, as it were. That's the interviewing bias.

Tr. at 210-11.

The trial court took the matter under advisement and issued a letter opinion on June 11, 2010, finding petitioner guilty of Sodomy in the First Degree and Sexual Abuse in the First Degree. Resp't Ex. 112. The trial court merged the sexual-abuse charge with the sodomy charge and sentenced petitioner to 300 months of imprisonment. Tr. 422; Resp't Ex. 101.

Petitioner directly appealed; the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. Resp't Exs. 105 at 24, 106-07. Petitioner then sought

post-conviction relief (PCR) on grounds that his counsel provided ineffective assistance in several respects. Resp't Ex. 124. The PCR court denied relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. Resp't Exs. 127, 131 at 23, 132-33.

On February 2, 2017, petitioner sought federal habeas relief.

## DISCUSSION

Petitioner asserts eight grounds in support of his habeas petition. Pet. at 6-9 (ECF No. 2). However, in his supporting brief, petitioner presents argument in support of only Ground One. *See generally* Pet'r Br. (ECF No. 54). Respondent argues that habeas relief should be denied on Grounds One through Four and Six through Eight, arguing that petitioner did not address the claims in his supporting brief and failed to sustain his burden to prove that habeas relief is warranted. This Court agrees that petitioner has failed to sustain his burden to prove habeas relief is warranted on the unargued claims. *See Mayes v. Premo*, 766 F.3d 949, 957 (9th Cir. 2014) (habeas petitioner bears the burden of proving his case); *Davis v. Woodford*, 384 F.3d 628, 637-38 (9th Cir. 2004)(same). Accordingly, habeas relief is denied as to the claims alleged in Grounds One through Four and Six through Eight.

In Ground Five, petitioner asserts that trial counsel rendered ineffective assistance by failing to call Marcy Stenerson, a DHS caseworker, as a witness during his trial. Stenerson investigated K.N.'s disclosures and issued a report of her findings. Resp't Ex. 122 at 6-15. Stenerson's report described interviews with Lewis, who informed Stenerson that she had concerns about the influence Lola Scott exerted over K.N. and Morrocco's involvement in the investigation. In particular, Lewis told Stenerson that she was "concerned that it is a custody issue and that [Scott] may have instigated the allegations." Resp't Ex. 122 at 10. The report

further described interviews with petitioner, Lola Scott, Nevin, Nevin's girlfriend, and K.N.'s cousins. Stenerson's report noted that petitioner passed a DHS polygraph examination and it was unclear "whether and to what extent" Morrocco was involved in the investigation. Stenerson also remarked that she could not interview K.N. to ask pertinent follow-up questions about the alleged abuse. Based on all of these factors, Stenerson concluded that she was "unable to determine" whether the abuse had occurred. Resp. Ex. 122 at 15.

Respondent argues that petitioner failed to exhaust this claim in the Oregon courts during his PCR proceedings, and it is now procedurally defaulted. *See* 28 U.S.C. § 2254(b)(1)(A) (requiring a state habeas petitioner to exhaust all available state court remedies before a federal court may consider granting habeas relief); *see also Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991) (if a claim was not fairly presented to the state courts, it is barred from federal review through procedural default); *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) ("A procedural default may be *caused* by a failure to exhaust federal claims in state court.").

Petitioner does not dispute that Ground Five is procedurally defaulted. Instead, petitioner maintains that the default should be excused due to the ineffective assistance of PCR counsel in failing to raise this claim. *See Martinez v. Ryan*, 566 U.S. 1 (2012) (holding that the ineffective assistance of counsel during initial post-conviction proceedings may establish cause to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel). Regardless of procedural default and the *Martinez* exception, I find that petitioner's *Strickland* claim fails on the merits and does not support habeas relief. *See* 28 U.S.C. § 2254(b)(2) (providing that a federal habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

A habeas petitioner alleging the ineffective assistance of counsel must show that 1) "counsel's performance was deficient," and 2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, petitioner "must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Unless petitioner "makes both showings, it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Petitioner fails to establish either element.

In a letter written to petitioner shortly after the trial, trial counsel explained that he did not call Stenerson as a witness because "the passed polygraph was not admissible in court," and most of the information in her report was based on statements provided by Lewis, Lola Scott, Nevis, and Nevis's girlfriend – witnesses who all gave testimony at trial. Resp't Ex. 115. Generally, "informed decisions" and "strategic choices" by counsel must be respected "if they are based on professional judgment." *Strickland*, 466 U.S. at 681. Here, petitioner's counsel decided, in his professional judgment, that Stenerson's testimony would be cumulative of evidence already presented to the court and otherwise based on evidence the court could not receive. Counsel's strategic decision was not unreasonable; the persons who gave statements to Stenerson provided sworn testimony at trial and the polygraph results would not have been admitted. Further, Stenerson's testimony would have added little to petitioner's case when her conclusion was based, in part, on the lack of information regarding Morrocco's involvement and the inability to interview KN. In contrast, KN testified at trial and several witnesses provided testimony about the degree of Morrocco's involvement in the investigation.

For similar reasons, petitioner cannot show prejudice. Stenerson's "unable to determine" conclusion was based on petitioner's polygraph test; the "significant" custody issues between Lewis, Nevis, and Scott; the potential involvement of Morrocco; and her inability to question K.N. Resp. Ex. 122 at 15. As noted, the polygraph was inadmissible, and the trial court was well aware of the relevant custody issues and Morrocco's involvement in the investigation. Tr. at 136-37, 144-45, 154-56, 306-08, 378-401. Further, unlike Stenerson, the court heard the testimony of KN, which included questioning and cross-examination into areas Stenerson found concerning. Tr. 36-38, 60-65, 72, 74-75. Finally, petitioner's counsel presented the testimony of Dr. Johnson, who explained his concerns with K.N.'s forensic examination and the possible unreliability of her allegations. Tr. 206-11.

In light of the testimony and evidence at trial, it is not reasonably probable that calling Stenerson as a witness would have altered the outcome. Accordingly, petitioner fails to establish that counsel alleged failure caused him prejudice.

## CONCLUSION

The Petition for Writ of Habeas Corpus (ECF No. 2) is DENIED and this case is DISMISSED. A Certificate of Appealability is denied on the basis that petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

DATED this  31st  day of March, 2020.

/s/Ann Aiken
Ann Aiken
United States District Judge